Hernandez v.SOT



NUMBER 13-99-568-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

____________________________________________________________________

JESSE HERNANDEZ, A/K/A "BUMPY," Appellant,


v.


THE STATE OF TEXAS, Appellee.

____________________________________________________________________


On appeal from the 105th District Court of Nueces County, Texas.

____________________________________________________________________


O P I N I O N

Before Justices Hinojosa, Yañez, and Chavez (1)

Opinion by Justice Hinojosa

A jury found appellant, Jesse Hernandez a/k/a "Bumpy," guilty of engaging in organized criminal activity (2) and murder
(3)and assessed his punishment at life imprisonment and a $5,000 fine for the organized criminal activity and fifty years
imprisonment and a $5,000 fine for the murder. Both sentences were ordered to run concurrently. In fourteen issues,
appellant contends: (1) the evidence is legally and factually insufficient to support the judgment; (2) he received ineffective
assistance of counsel during trial; (3) the trial court erred by admitting improper evidence; and (4) a fatal variance exists
between the offenses charged in the indictment and the evidence presented at trial. We affirm.

A. Evidence at Trial

It is undisputed that on August 10, 1998, the victim, Luis "Huicho" Luna ("Luis"), was shot to death. What is disputed is
the role appellant played in the murder.

The State sought to prove that appellant, Jesse "Trece" Casso ("Casso"), Jeremy Munguia ("Munguia"), Rudy "Rhino"
Contreras ("Contreras") and Jason "Chino Boy" Luna ("Jason"), all members of the "Raza Unida" gang, conspired to
murder Luis in retaliation for allegedly being disrespectful to a Raza Unida officer. The record reflects that Luis's body was
found lying beside Carbon Plant Road in Corpus Christi, near a burning Oldsmobile which had been stolen several days
before. Testimony showed that the murder occurred between 1:45 and 2:15 a.m. on August 10, 1998. The autopsy
established that Luis died from eight bullet wounds to the abdomen, neck, chest and head.

1. Testimony of Investigating Officers


According to Officer Thomas Mylett, Contreras told him where to find the Norinco SKS semi-automatic rifle used in Luis's
murder. Contreras also told Mylett that he had been ordered to perform a hit on someone named Lance, but that he did not
want to do it. John Hornsby, firearms examiner for the Corpus Christi Police Department, testified that bullets removed
from Luis's body were fired from the recovered rifle.

2. Testimony of Contreras


Contreras was a member of Raza Unida, a gang that was involved in "a lot of drug dealing, killings [and] beating up
people." Raza Unida has a certain symbol or emblem and a chain of command. Contreras and Munguia were soldiers;
Casso was a captain; Jason and Luis were "prospects." Luis was in trouble with the gang because he had left a Raza Unida
party to be with a girl, cursed at Raza Unida members, and placed a gun on a table so that it pointed at a Raza Unida
ranking officer named Sapo. Sapo told Contreras, "[T]hat's automatic death, you know, put him in a box, that's disrespect."

Contreras, appellant, and Munguia went to Casso's house so that appellant could give Casso some money. While they were
there, Casso told them that Luis had to be killed. Casso chose Contreras, Munguia, and Jason to kill Luis. Casso
whispered something in appellant's ear while looking at Contreras. The men left in Contreras's car, and dropped appellant
off. Before they left appellant's house, appellant put his arm around Contreras's shoulder and said, "You know what time it
is, right? Y'all better do it. If you don't do it, you know what is going to happen." Contreras understood that to mean that
he would be killed if he did not kill Luis.

Contreras drove to appellant's "tienda, (4) which is a crack house," and picked up Jason. Munguia then told Contreras to
drive to Munguia's house, which was close to Luis's house. Munguia exited the vehicle and returned with Luis. The group
proceeded to Munguia's house, where there was a maroon Oldsmobile parked in the garage. Munguia gave Luis and Jason
each a pair of gloves, and told them to follow him and Contreras. The group proceeded to the home of Munguia's brother
and picked up a gun wrapped in a pink towel. They all then got into the Oldsmobile. Contreras drove, Luis was in the
front passenger seat, Jason was in the left back seat, and Munguia was in the right back seat. Munguia said, "Nobody better
hesitate." Munguia told Contreras to exit the freeway. Contreras felt the gun touch the back of his head and then his right
shoulder. Munguia directed Contreras to stop the car so he could put the gun in the trunk. They all got out of the car, and
Contreras thought he was going to be killed because he owed Raza Unida member Mark Alaniz some drug money. Jason
shot Luis multiple times. Before he was shot, Luis asked in Spanish, "What did I do?"

Afterwards, the remaining three got back in the car and Contreras drove until he was ordered to stop. Munguia and Jason
exited the car and returned without the gun. They picked up Contreras's car and drove it to a location near a refinery. Jason
followed in the Oldsmobile. Munguia and Jason set the Oldsmobile on fire, and all three rode in Contreras's car to
appellant's house.

When they reached appellant's house, they knocked at the back door. Appellant appeared, got a trash bag, put the gloves in
the trash bag, and "suggested he would get rid of all the evidence." Appellant noticed Jason had a lot of blood on his
clothing. Appellant got some clothes from his room and instructed Jason to take a shower, telling him to "scrub his hands
real good because he might have some gun powder on his hands." Appellant washed Jason's clothes in the washing
machine. Jason changed into appellant's clean clothes. Contreras dropped off Munguia and Jason and returned to
appellant's house, where he and his wife and son were living.

Contreras testified that he had been a member of Raza Unida for a year and a half. He joined because he was told that Raza
Unida "was more than a prison gang. They would help you out." He did not realize what he was getting into. They told
him they would provide him with a place to live and money. He had no place to stay, and moved into appellant's house.
Soon he learned there were strings attached; "you have to do what you're told." At first, Contreras was sent to collect
money from various people; if they didn't pay, he had to beat them up. He also sold drugs and acted as a drug courier for
the gang.

Contreras was a "prospect" for six months. He proved himself by following orders. If you do not follow the rules in Raza
Unida, there are three levels of sanctions. The first level, a "30-second workout," is when three guys beat you up for 30
seconds. The next level, a "30-minute workout," "[t]hey just beat you up real bad which is called H Town [meaning
"hospital"] . . . they just beat you up to where you can't get up no more." The third level is called being "put in a box,"
which means you will be killed. If you are supposed to do a "cameo" or hit and you hesitate, you are automatically killed
too. As a Raza Unida prospect, Contreras participated in the first two levels of sanctions. He wanted out of the gang, but
there was no way out except death. That's when he decided to call the police. He did not want to participate in Luis's
murder, but he could not refuse or inform the police because his wife and baby son were at appellant's house, and he knew
the gang would retaliate against them.

Contreras, Munguia, Jason, and another Raza Unida member by the name of Fabian were ordered to kill Lance, who was
not a member of Raza Unida, because Lance was "[p]utting Mark [Alaniz] down and trying to take away Mark's connection
. . . his supplier." Contreras knew that another Raza Unida member, Mark Posada, had been killed because he had hesitated
to carry out a hit. The punishment for giving a statement or testifying is death. Contreras knew the location of the murder
weapon in this case because appellant told him where it was and offered him money to retrieve it. That is when Contreras
contacted the police. In exchange for his testimony, Contreras was given deferred adjudication probation for ten years.

3. Testimony of Munguia


Munguia testified that he had become a member of Raza Unida when he was in prison for burglary, theft, unauthorized use
of a motor vehicle, and possession of cocaine. His father is a ranking Raza Unida member. Munguia went with appellant
and Contreras to Casso's house because appellant had to drop off money from drug sales. Casso sent Munguia, appellant,
and Contreras to kill Luis. They dropped off appellant, who told Contreras to "[m]ake sure the job is done. If not, you
know what it is." They picked up Jason at appellant's crack house. Jason had to kill somebody to become a full-fledged
Raza Unida member. Munguia told Jason what he had to do. Then they picked up Luis, telling him he was going to "do a
hit" in Odem, Texas. They first stopped to buy gloves at a Circle K, so that fingerprints would not get on the gun or the
stolen car. They then went to Munguia's house and wiped down the stolen car, which was in the garage. Paul Moreno had
stolen the car for appellant. Munguia was "taking care of" the car for appellant, who wanted the motor.

Jason and Luis got in the stolen car and Munguia and Contreras got back in Contreras's car. They drove to a house on
Leopard Street and picked up the gun. They then got back in the stolen car and drove on Interstate Highway 37 toward
Odem. Munguia told Contreras to exit when he realized Luis was suspicious. Munguia told Luis that they needed to stop
so he could put the gun in the trunk. When they got out, Munguia and Jason walked back toward the truck. Jason shot
Luis as he was getting out of the car. Luis fell back in the car with his head resting on the passenger seat. Jason shot him
again in the head. Jason shot Luis a total of eight times. There were eight bullets in the clip. Luis's last words were, "Que
hice yo?" (5) After driving to a back road, Munguia and Jason left the gun between some bushes and a fence. They picked
up Contreras's car, stopped to buy lighter fluid at a Coastal Mart, then torched the stolen car. They then went to appellant's
house; appellant opened the door and took the gloves. The back of Jason's shirt was bloody because he sat in the front
passenger seat, which was covered with Luis's blood. Appellant put Jason's clothes in the washer and called Casso to tell
him the hit was done.

Munguia was a soldier in Raza Unida. He was obligated to take orders from Casso, but was not obligated to take orders
from other soldiers. Death is the punishment for not following orders. Munguia knew Raza Unida members who had been
killed for not following orders: Mark Posada, Isaac Soliz, Luis and others. 

In exchange for his testimony, Munguia received a plea-bargained sentence of ten years in prison. He "strongly" believes
he will not survive his prison term.

While he was incarcerated in the Nueces County Jail, a Raza Unida member named Johnny Esparza told Munguia that
appellant had said Munguia would be killed because he was a police informant. At the time, Munguia had not cooperated
with the police. Munguia's girlfriend called the police, and he and Esparza were removed from the Raza Unida section at
the jail.

4. Testimony of DPS Criminalist

Charles Parker, a criminalist with the Texas Department of Public Safety, determined that two letters were most likely
written by Jason. The two letters were admitted into evidence.

One letter is to his "Nana." In the letter, Jason says that he is "in a gang call [sic] RAZA UNIDA." He also says: "I did kill
someone . . . yes I did." 

5. Testimony of Alice Alaniz

Alice Alaniz had a two and one-half year relationship with appellant, and they have a child together. She was living with
appellant on August 10, 1998. They were in bed that night when the doorbell rang between 1:30 and 2:00 a.m. Appellant
answered the door, and Alaniz heard the voices of Munguia, Jason and Contreras. Appellant got some clothes from their
bedroom and gave them to Jason. The washer was turned on during the visit. When she looked in the washer the next
morning, she found shorts, a "Nike" shirt and a pair of white "Converse All-Stars." She knew the clothing belonged to
Jason because she and appellant frequently bought clothing for Raza Unida members. In exchange for her testimony,
Alaniz was to receive a lesser sentence on a drug possession charge. 

6. Testimony of Johnny Joe Esparza

Johnny Joe Esparza was a Raza Unida soldier in October 1998. On October 18, 1998, while they were incarcerated
together at the Nueces County Jail, appellant told Esparza there was going to be a hit on Munguia because he was a
"snitch." Appellant was waiting on the "paperwork" from Raza Unida officers Roman "Boo" Felan and Raul "Buga"
Sanchez. Appellant said Esparza had to do the hit "to get [himself] out of the dark side of the organization" because he
owed money. Technically, Esparza did not feel appellant had the authority to order the hit without the "paperwork"
because appellant was just a soldier, like Esparza. However, in reality, Esparza felt that appellant did have authority to
issue his own orders because he was very close to Casso. Appellant was a "moneymaker" for Casso. If appellant had told
Esparza to kill someone, he would have done it. He did not want to kill Munguia because they were "home boys." 

Appellant's plan was to provoke a fight with Munguia's brother, who was also in jail, then kill Munguia when he joined in.
Appellant told Esparza that the weapon they would use was a "grill from a light taken off from the visiting side of the
inmates which was folded in pieces into a trash bag." (6) Later, when Esparza saw Munguia, he told him he was going to be
hit for being a snitch. Munguia's wife contacted the police and Esparza and Munguia were removed from the jail unit about
thirty minutes later in a staged "shakedown." He received shock probation on a prior conviction in exchange for his
testimony. Esparza is currently incarcerated on other, unrelated charges, but does not have a deal.

B. Sufficiency of the Evidence

When an appellate court reviews the legal sufficiency of the evidence, it looks at all the evidence in the light most favorable
to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Patrick v. State, 906 S.W.2d 481, 486 (Tex. Crim. App. 1995); Turro v. State, 867 S.W.2d 43, 46-47 (Tex. Crim.
App. 1993). Sufficiency of the evidence is measured by the hypothetically correct jury charge, which accurately sets out
the law, is authorized by the indictment, and does not unnecessarily increase the State's burden of proof. Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Cano v. State, 3 S.W.2d 99, 105 (Tex. App.-Corpus Christi 1999, pet. ref'd). 
The jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, is free to accept or
reject all or any part of the testimony of any witness. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1981); Sharp v.
State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); Bowden v. State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982).

When an appellate court reviews the factual sufficiency of the evidence, it views all the evidence in a neutral light, and sets
aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
Johnson, 23 S.W.3d at 6-7 (citing Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996)). The appellate court
considers all of the evidence in the record related to the appellant's sufficiency challenge, comparing the weight of the
evidence that tends to prove guilt with the evidence that tends to disprove it. Santellan v. State, 939 S.W.2d 155, 164 (Tex.
Crim. App. 1997). In conducting its factual sufficiency review, the appellate court reviews the fact finder's weighing of the
evidence and is authorized to disagree with the fact finder's determination. Johnson, 23 S.W.3d at 7; Clewis, 922 S.W.2d at
133. However, this review must employ appropriate deference to prevent the appellate court from substituting its judgment
for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of
the weight and credibility of the evidence. Johnson, 23 S.W.3d at 7; Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App.
1996). The fact finder may believe one version of the facts over another. See, e.g., Nonn v. State, 13 S.W.2d 434, 441-42
(Tex. App.-Corpus Christi 2000), rev'd on other grounds, 2001 Tex. Crim. App. LEXIS 24 (Tex. Crim. App. April 4,
2001); Barnes v. State, 839 S.W.2d 118, 122 (Tex. App.-Dallas 1992, pet. ref'd).

In the instant case, appellant was charged by indictment with one count of engaging in organized criminal activity
("EOCA") in two separate paragraphs. The first paragraph alleges appellant conspired to murder Luis as a member of a
combination. The second paragraph alleges appellant conspired to murder Luis as a member of a criminal street gang, Raza
Unida.

The penal code provides that a person commits the offense of EOCA "if, with the intent to establish, maintain, or
participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or
conspires to commit . . . murder." Tex. Pen. Code Ann. § 71.02(a) (Vernon Supp. 2001). A "combination" means three or
more persons who collaborate in carrying on criminal activities. Tex. Pen. Code Ann. § 71.01(a) (Vernon Supp. 2001). A
"criminal street gang" means three or more persons having a common identifying sign or symbol or an identifiable
leadership who continuously or regularly associate in the commission of criminal activities. Tex. Pen. Code Ann. §
71.01(d) (Vernon Supp. 2001). "Conspires to commit" means that a person agrees with one or more persons that they or
one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform
an overt act in pursuance of the agreement. Tex. Pen. Code Ann. § 71.01(b) (Vernon Supp. 2001). An agreement
constituting conspiring to commit may be inferred from the acts of the parties. Id.

In his first issue, appellant contends the evidence is insufficient to prove he collaborated in carrying on criminal activities.
In support of this contention, appellant cites Nguyen v. State, 1 S.W.2d 694, 697 (Tex. Crim. App. 1999).

In the Nguyen case, Nguyen and several other men conspired to kill a man they thought had insulted a woman friend of
theirs. Id. at 695 n.1. The court of criminal appeals reversed Nguyen's EOCA conviction because there was no evidence
that he had participated in any offense, other than the murder in question. Id. at 696. The court held that proof of
"something more" than the enumerated underlying offense is required to sustain an EOCA conviction. Id. The instant case
is very different.

In this case, the evidence shows: (1) that appellant was a member of Raza Unida, a criminal street gang having an
identifiable sign and an identifiable leadership; (2) that Raza Unida was engaged in various aspects of the drug trade; (3)
that appellant ran a crack house for Casso; (4) that appellant was present when Casso gave the order to kill Luis; (5) that
Luis's murder was in furtherance of the criminal street gang's objectives; and (6) that appellant committed an overt act by
threatening Contreras and by participating in the destruction of evidence of the crime. The trial testimony also shows that
appellant continued his criminal activities even while incarcerated in the Nueces County Jail, where he attempted to arrange
Munguia's murder. Accordingly, we hold the evidence is legally and factually sufficient to support the jury's verdict that
appellant committed the offense of EOCA.

In his fourth issue, appellant contends the evidence is insufficient to support his murder conviction. Specifically, he asserts
that because there is no evidence showing he was present at the scene of the murder, the evidence is insufficient to sustain a
murder conviction. Appellant, however, was indicted for murder as a party. (7) Under the law of parties, it was not
necessary for the State to prove that appellant was present when the offense was committed. See Morrison v. State, 608
S.W.2d 233, 234-35 (Tex. Crim. App. 1980); Cross v. State, 550 S.W.2d 61, 64 (Tex. Crim. App. 1977). 

In his second issue, appellant contends the evidence is insufficient to support his conviction for EOCA because there was
no non-accomplice testimony corroborating his participation in organized criminal activity. In his third issue, he contends
the evidence is insufficient to support the murder conviction because there is no non-accomplice testimony corroborating
his participation in the murder.

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect
the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the
offense. Tex. Code Crim. Proc. art. 38.14 (Vernon 1979). In order to determine whether the accomplice testimony is
corroborated, we eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in
evidence tend to connect appellant to the offense. McDuff v. State, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997); Burks v.
State, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994); Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). The
accomplice testimony need not be corroborated on every element of the offense. Warren v. State, 514 S.W.2d 458, 463
(Tex. Crim. App. 1974), overruled on other grounds, Reed v. State, 744 S.W.2d 112 (Tex. Crim. App. 1988); Griffin v.
State, 936 S.W.2d 353, 357 (Tex. App.-Houston [14th Dist.] 1996, pet ref'd). The non-accomplice testimony does not have
to directly link the appellant to the crime, nor does it have to establish his guilt beyond a reasonable doubt; but rather, the
non-accomplice evidence merely has to tend to connect appellant to the offense. McDuff, 939 S.W.3d at 613; Burks, 876
S.W.2d at 888. Thus, there must simply be some non-accomplice evidence which tends to connect appellant to the
commission of the offense alleged in the indictment. McDuff, 939 S.W.2d at 613; Gill v. State, 873 S.W.2d 45, 48 (Tex.
Crim. App. 1994). All of the surrounding facts and circumstances may be looked to for corroboration, and the
corroborative evidence may be circumstantial or direct. Brown v. State, 672 S.W.2d 487, 488 (Tex. Crim. App. 1984).
Evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper
corroborating evidence. McDuff, 939 S.W.2d at 613; Cockrum v. State, 758 S.W.2d 577, 581 (Tex. Crim. App. 1988).

Here, the testimony of Alice Alaniz, appellant's girlfriend, shows that: (1) appellant was in the company of his accomplices
near the time of the offense; (2) he washed Jason's clothing; and (3) he gave Jason clean clothing. (8) This evidence tends to
connect appellant with the murder.

Esparza's testimony establishes that appellant was a Raza Unida member engaged in criminal activities that were ordered
by Raza Unida officers, specifically the planned murder of Munguia in the Nueces County Jail in retaliation for "snitching"
about the murder of Luis Luna. This evidence tends to connect appellant both to Luis's murder and to his participation in
the ongoing criminal activities of Raza Unida. We hold there is sufficient non-accomplice evidence corroborating
appellant's convictions for EOCA and murder.

In his fifth issue, appellant contends the evidence is insufficient to support a murder conviction under the law of parties
because there is "no evidence of an agreement to kill Luis Luna before or contemporaneous with the murder."

Participation in a criminal offense may be inferred from the circumstances. Beardsley v. State, 738 S.W.2d 681, 684 (Tex.
Crim. App. 1987). While agreement by the parties to act together in a common design can seldom be proved by direct
evidence, reliance can be had on the actions and words of the parties showing, by direct or circumstantial evidence, an
understanding and common design to do a certain act. Ex parte Prior, 540 S.W.2d 723, 727-28 (Tex. Crim. App. 1976).

Contreras and Munguia both testified that appellant encouraged the murder by threatening Contreras. Appellant argues that
because there is no non-accomplice corroboration of this fact, the evidence is insufficient to sustain his murder conviction.
However, as we noted above, the State is not required to corroborate accomplice testimony on every element of the offense.
See Warren, 514 S.W.2d at 463; Griffin, 936 S.W.2d at 357. Instead, we look to see if there is non-accomplice evidence
tending to connect the defendant with the offense. See Mc Duff, 939 S.W.2d at 613. As we also noted above, both the
EOCA conviction and the murder conviction were sufficiently corroborated by non-accomplice evidence.

In his sixth issue, appellant complains the evidence is insufficient to support his murder conviction under the law of parties
because he did not know of the "intent of the murderer to commit the crime." He contends "the evidence established that
[he] did not know the murder would result from Jason Luna's 'shooting with a firearm.'" 

The testimony of both Contreras and Munguia establish that appellant encouraged the murder when he threatened
Contreras, and that he had full knowledge of the plan to kill Luis. As we noted above in the discussion of appellant's fifth
issue, it is not necessary for the State to provide non-accomplice testimony of every element of the crime. See Warren, 514
S.W.2d at 463; Griffin, 936 S.W.2d at 357. Instead, we look to see if there is non-accomplice evidence tending to connect
the defendant with the offense. See Mc Duff, 939 S.W.2d at 613. We hold that both the EOCA conviction and the murder
conviction were sufficiently corroborated by non-accomplice evidence.

In his eighth issue, appellant contends the trial court erred in denying his motion for directed verdict because the evidence
was insufficient to prove he committed all the overt acts alleged in the indictment.

The standard of review applicable to a motion for directed verdict is the same as that used in reviewing the legal sufficiency
of the evidence. Havard v. State, 800 S.W.2d 195, 199 (Tex. Crim. App. 1989); Butler v. State, 769 S.W.2d 234, 239 (Tex.
Crim. App. 1989). Both paragraphs of the EOCA count allege appellant committed the following overt acts:

by threatening Rudy Contreras, by taking gloves from Rudy Contreras, Jeremy Munguia and Jason Luna after the killing of
Luis Luna, by taking Jason Luna's clothes after the killing of Luis Luna, and by allowing Jeremy Munguia, Jason Luna, and
Rudy Contreras to enter a house following the murder of Luis Luna . . .

The testimony of Contreras and Munguia establishes that appellant performed all these overt acts. The testimony of Alaniz
provides sufficient non-accomplice testimony. 

We hold the evidence is legally and factually sufficient to support appellant's convictions for EOCA and murder.
Appellant's first, second, third, fourth, fifth, sixth, and eighth issues are overruled.

B. Variance

In his ninth issue, appellant contends there is a fatal variance between the crimes charged in the indictment and the State's
evidence at trial. Specifically, appellant asserts that a variance resulted in the charging of the overt acts in the ECOA in the
conjunctive, but the jury charge was worded in the disjunctive.

The jury charge stated:

JESSE HERNANDEZ aka BUMPY did perform the overt act of threatening Rudy Contreras or taking gloves from Rudy
Contreras, Jeremy Munguia and Jason Luna after the killing of Luis Luna, or by taking Jason Luna's clothes after the killing
of Luis Luna or by allowing Jeremy Munguia, Jason Luna and Rudy Contreras to enter a house following the murder of
Luis Luna . . . 

(emphasis added).

It is well-settled that it is proper for an indictment to allege the ways an offense may have been committed in the
conjunctive, and for the different ways to be charged to the jury in the disjunctive. Rosales v. State, 4 S.W.3d 228, 231
(Tex. Crim. App. 1999); White v. State, 890 S.W.2d 69, 72 (Tex. Crim. App. 1994); Kitchens v. State, 823 S.W.2d 256,
258 (Tex. Crim. App. 1991). We hold there was no fatal variance between the indictment and the State's evidence at trial.
We overrule appellant's ninth issue.

C. Evidentiary Issues

In his eleventh issue, appellant contends the trial court erred in allowing Esparza's testimony regarding appellant's threats.
Appellant asserts this violated Texas Rule of Evidence 404(a) because it made an impermissible inference concerning
appellant's character. In his twelfth issue, appellant asserts the trial court violated Texas Rule of Evidence 404(b) in
admitting this evidence.

The admission or exclusion of evidence is within the discretion of the trial court, see Ladd v. State, 3 S.W.3d 547, 567
(Tex. Crim. App. 1999), including the admission of extraneous offense evidence during the guilt-innocence phase. Lawton
v. State, 913 S.W.2d 542, 552 (Tex. Crim. App. 1995); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1990). Rule 404(a) provides that evidence of a person's character or character trait is not admissible for the purpose of
proving action in conformity therewith on a particular occasion. Tex. R. Evid. 404(a). However, rule 404(b) provides that
evidence of other crimes, wrongs, or acts may: 

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident. . . . 

Tex. R. Evid. 404(b); see also, Montgomery, 810 S.W.2d at 390-91. A party may introduce such evidence where it
logically serves to make more or less probable (1) an elemental fact, such as intent or identity, (2) an evidentiary fact, such
as motive, opportunity, or preparation, leading inferentially to an elemental fact, or (3) defensive evidence undermining an
elemental fact. Santellan v. State, 939 S.W.2d 155, 168-69 (Tex. Crim. App. 1997). Evidence of extraneous offenses is
admissible to corroborate accomplice witness testimony. Lawton v. State, 913 S.W.2d 542, 553 n. 9 (Tex. Crim. App.
1995).

Appellant characterizes Esparza's testimony as being admitted:

for the sole purpose of proving [appellant] threatened Rudy Contreras. The State wanted the jury to believe that if
[appellant] threatened Esparza, then he must also have threatened Rudy Contreras.

However, under Rule 404(b), Esparza's testimony regarding appellant's plan to murder Munguia while they were all
confined in the Nueces County Jail was relevant to material issues in the case. It showed appellant's authority to order
other Raza Unida members to commit murder and appellant's strong desire to murder Munguia, even before the
"paperwork" from Raza Unida officers was received, in retaliation for Munguia's alleged cooperation with the police in the
Luis Luna murder investigation. This is non-accomplice testimony tending to connect appellant with Luis's murder. In
other words, appellant's plan to kill Munguia for "snitching," independent of Raza Unida orders, suggests that appellant had
a personal motive for wanting Munguia dead, i.e., to cover up his own involvement in Luis's murder. We hold the trial
court did not err in admitting Esparza's testimony. (9) Appellant's eleventh and twelfth issues are overruled.

In his fourteenth issue, appellant contends he is entitled to a new trial because the trial court erred in allowing witnesses to
testify concerning his gang-related activities "because his participation in a gang would not be admissible if he were being
tried solely for murder."

However, appellant overlooks the fact that he was also charged with one count of EOCA, making evidence of his gang
involvement necessary to prove that (1) appellant was a member of Raza Unida, and (2) Raza Unida was a criminal street
gang, which is defined as "three or more persons having a common identifying sign or symbol or an identifiable leadership
who continuously or regularly associate in the commission of criminal activities." Tex. Pen. Code. Ann. § 71.01(d)
(Vernon Supp. 2001)); see also Roy v. State, 997 S.W.2d 863, 867 (Tex. App.-Fort Worth 1999, pet. ref'd) (when a
defendant is charged with EOCA under section 71.02 of the penal code, the State is entitled to introduce evidence that the
defendant was a gang member and regularly engaged in criminal activities such as the illegal sale and distribution of drugs).

Appellant could have moved to sever the counts, (10) but elected not to do so. Even if he had, because the motive for the
murder was that Luis had broken Raza Unida rules and disrespected an officer, evidence concerning appellant's
membership in Raza Unida, and Raza Unida's various criminal activities, could still have been admissible under Texas
Rule of Evidence 404(b) as evidence of the motive, plan, preparation, knowledge or intent of the participants. See Tex. R.
Evid. 404(b).

We find no abuse of discretion in the trial court's admission of testimony of appellant's gang membership and gang-related
activities. Appellant's fourteenth issue is overruled.

D. Ineffective Assistance of Counsel

In his seventh, tenth, and thirteenth issues, appellant contends he received ineffective assistance of counsel. Claims of
ineffective assistance are analyzed under the rule set forth in Strickland v. Washington, 466 U.S. 668 (1984), and adopted
by Texas courts in Hernandez v. State, 726 S.W.2d 53, 56-56 (Tex. Crim. App. 1986). The Strickland test is the
benchmark for judging whether counsel's conduct has so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a reliable result. Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999) (citing McFarland v. State, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992). The appellant must first show that trial
counsel's performance was not reasonably effective, falling below an objective standard of reasonableness under the
prevailing professional norms. Strickland, 466 U.S. at 694; Thompson, 9 S.W.3d at 812-13. A showing of deficiency
requires a demonstration that trial counsel made errors so serious that he was not functioning as the counsel guaranteed a
defendant under the Sixth Amendment. Strickland, 466 U.S. at 687. We must presume that counsel is better positioned
than the appellate court to judge the pragmatism of the particular case, and that counsel made all significant decisions in the
exercise of reasonable professional judgment. Young v. State, 991 S.W.2d 835, 837 (Tex. Crim. App. 1999). There is also
a strong presumption that trial counsel's conduct was reasonable and constitutes sound trial strategy. Strickland, 466 U.S.
at 689; McFarland, 845 S.W.2d at 843. The "reasonably effective assistance" standard does not mean errorless counsel. Ex
parte Felton, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991); Hernandez v. State, 799 S.W.2d 507, 508 (Tex. App.-Corpus
Christi 1991, pet. ref'd).

If the appellant can demonstrate deficient assistance under the first part of the Strickland test, he must then show that there
is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been
different. Strickland, 466 U.S. at 694; Thompson, 9 S.W.3d at 812; Washington v. State, 771 S.W.2d 537, 545 (Tex. Crim.
App. 1989). "A reasonable probability" means "a probability sufficient to undermine confidence in the outcome."
Strickland, 466 U.S. at 694; Thompson, 9 S.W.3d at 812; Ex parte Walker, 777 S.W.2d 427, 430 (Tex. Crim. App. 1989).
The prejudice element requires a showing that trial counsel's errors were so serious as to deprive the defendant of a fair trial
- one whose result is reliable. Strickland, 466 U.S. at 687. The totality of the representation is evaluated from counsel's
perspective at trial, not his isolated acts or omissions in hindsight. Ex parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim.
App. 1990); Wilkerson v. State, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).

The assessment of whether a defendant received effective assistance of counsel must be made according to the facts of each
case. Ex parte Scott, 581 S.W.2d 181, 182 (Tex. Crim. App. 1979); Stone v. State, 17 S.W.3d 348, 350 (Tex. App.-Corpus
Christi 2000, pet. ref'd). The appellant must prove his claim of ineffective assistance of counsel by a preponderance of the
evidence. Stafford v. State, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991). Furthermore, he must show ineffective
assistance firmly rooted in the record. Jackson v. State, 877 S.W.2d 768, 771-72 (Tex. Crim. App. 1994). We may not
speculate as to the reasons behind trial counsel's actions nor should we try to second guess trial counsel's tactical decisions
which do not fall below the objective standard of reasonableness. Young, 991 S.W.2d at 837-38; Solis v. State, 792 S.W.2d
95, 100 (Tex. Crim. App. 1990); Stone, 17 S.W.3d at 350.

In his seventh issue, appellant complains he received ineffective assistance of counsel because his trial counsel failed to
object to the court's instruction in the charge on the law of parties. Appellant asserts the evidence was legally insufficient
to sustain a conviction on the law of parties due to the State's failure "to offer any evidence that [appellant] was present at
the commission of the offense, or that he participated as a party before or contemporaneous with the murder."

We have already held the evidence is legally sufficient to sustain appellant's conviction of murder as a party. Because the
instruction on the law of parties was supported by the evidence, we conclude appellant's trial counsel was not ineffective
for failing to object to its inclusion in the charge. Appellant has, therefore, failed to overcome the presumption of
reasonableness, and has failed to meet the first requirement of the Strickland test.

In his tenth issue, appellant contends he received ineffective assistance of counsel because his trial counsel failed to object
to the charge based on a variance between the offenses charged and the proof at trial. We have already held there is no
variance between the offenses charged in the indictment and the State's proof at trial. Because there is no variance, we
conclude appellant's trial counsel was not ineffective for failing to object to the charge on this basis. Appellant has,
therefore, failed to overcome the presumption of reasonableness, and has failed to meet the first requirement of
theStrickland test.

In his thirteenth issue, appellant asserts he received ineffective assistance of counsel because his trial counsel failed to
object to the admission of Esparza's testimony. However, in the briefing of his eleventh and twelfth issues concerning the
propriety of the admission of this evidence, appellant says that his trial counsel did object to the admission of Esparza's
testimony. The record shows that counsel did object. Therefore, appellant has preserved nothing for appeal on this issue.

Even if appellant's trial counsel had failed to object to the admission of Esparza's testimony, we have held that the trial
court did not abuse its discretion in admitting this testimony. Therefore, appellant's trial counsel would not have been
ineffective for failing to object to the testimony. Because appellant would have failed to overcome the presumption of
reasonableness, and would have failed to meet the first requirement of the Strickland test, we would overrule this issue.

After reviewing the entire record, we cannot say that appellant received ineffective assistance of counsel. Appellant's
seventh, tenth, and thirteenth issues are overruled.

The judgment of the trial court is affirmed.

FEDERICO G. HINOJOSA

Justice



Publish. Tex. R. App. P. 47.3.

Opinion delivered and filed this

the 21st day of June, 2001.

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to
Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. See Tex. Pen. Code Ann. § 71.02(a) (Vernon Supp. 2001).

3. Appellant was found guilty of murder as a party. See Tex. Pen. Code Ann. § 7.02 (Vernon 1994); Tex. Pen. Code Ann.
§ 19.02(b) (Vernon 1994).

4. "Tienda" is Spanish for "store."

5. "Que hice yo" is spanish for "what did I do."

6. Officer Gary Smith testified that such a grill could be used to fashion a weapon capable of serious bodily injury or death.

7. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote
or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit
the offense. See Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon 1994).

8. Acts committed after the offense is completed cannot make one a party to the offense. Morrison v. State, 608 S.W.2d
233, 235 (Tex. Crim. App. 1980). However, acts committed before, during and after the offense may be considered by the
court in deciding whether a defendant participated in a common scheme for purposes of party liability. Beier v. State, 687
S.W.2d 298, 303 (Tex. Crim. App. 1985); Suarez v. State, 31 S.W.3d 323, 327 (Tex. App.-San Antonio 2000, no pet.).

9. We note that in order for extraneous offense evidence to be admissible, a two-part test must be met. First, the
transaction must be relevant to a material issue in the case, and second, the relevancy value of the evidence must outweigh
its inflammatory or prejudicial potential. Montgomery v. State, 810 S.W.2d 372, 390-91 (Tex. Crim. App. 1990); Crank v.
State, 761 S.W.2d 328, 342 (Tex. Crim. App. 1988); Perry v. State, 933 S.W.2d 249, 253 (Tex. App.-Corpus Christi 1996,
pet. ref'd). However, appellant has not raised the second requirement as an issue on appeal, so we will not address it. Tex.
R. App. P. 47.1.

10. See Tex. Pen. Code Ann. § 3.04(a) (Vernon Supp. 2001) (defendant has an absolute right to sever two or more
consolidated offenses); however, if the cases are severed and the defendant is convicted on both charges, the trial court may
order the two sentences to run consecutively. See Tex. Pen. Code Ann. § 3.04(a) (Vernon Supp. 2001).