**Odell BARNES, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 05–91–01168–CR, 05–91–01169–CR.**

Court of Appeals of Texas, Dallas.

Aug. 24, 1992.

Reginald R. Wilson, Marty Cannedy, Wichita Falls, for appellant.

John W. Brasher, Wichita Falls, for appellee.

Before ENOCH, C.J., and KINKEADE and ONION,[1] JJ.

## OPINION

KINKEADE, Justice.

Odell Barnes, Jr. appeals his jury convictions for aggravated sexual assault and burglary of a habitation. The jury assessed punishment at ninety-nine years'

---

1. The Honorable John F. Onion, Jr., Presiding Judge, retired, Court of Criminal Appeals, sitting by assignment.

confinement for aggravated sexual assault and thirty-five years' confinement and a $5000 fine for burglary of a habitation. In five points of error, Barnes argues that the trial court erred (1) in overruling his special plea of double jeopardy and (2) in allowing into evidence the complaining witness's in-court identification of him. He further argues that (3) the evidence is insufficient to support his convictions, (4) the State's DNA evidence was the product of an illegal search and seizure, and (5) the State failed to conduct its tests for the DNA evidence in accordance with accepted scientific procedures. Because the evidence is sufficient to support Barnes's convictions and because the trial court did not err in overruling Barnes's plea of double jeopardy and his motion to suppress the DNA evidence and in allowing into evidence the complaining witness's in-court identification of him, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

At approximately 1:00 a.m. on February 18, 1987, as the complainant walked through her dining room, Odell Barnes, Jr., who had broken into the home through an upstairs window, started hitting her over the head with a steam iron. When the complainant attempted to resist, Barnes threatened to shoot her. Barnes then took the complainant to her bedroom, beat her again, and raped her. Barnes demanded that she give him her money and jewelry. Barnes and the complainant went to her kitchen to get her jewelry. As she took her jewelry from the cabinet, the complainant saw Barnes's face from the side for a few seconds. They both then went to her bathroom to get the money from her purse. While she took money from her purse, the complainant saw Barnes's reflection in the mirror for a few minutes. Barnes then demanded that the complainant give him the keys to her car and show him how to start the car. After Barnes and the complainant went to her garage, he started her car and drove away. After the complainant discovered that her telephone line had been cut, she walked to a neighbor's house and called the police. The police took the complainant to a local hospital to treat her wounds and to get physical evidence of the sexual assault, including collecting specimens for a sexual assault kit.

Several weeks after the assault, the police department prepared a series of photographic identification arrays for the complainant to view. The police included Barnes in one of the photographic arrays. The complainant, however, failed to identify Barnes as her assailant. The complainant stated that she was unable to identify Barnes from the photographic array because Barnes's picture was dark and did not match the complexion of the person that she remembered. Nearly three years after the attack, the complainant called the police and identified Barnes as her assailant after watching the evening news. That particular night, the television newscast featured Barnes as the man who had been charged with the murder and rape of another woman. At trial, the complainant testified that, while Barnes raped and robbed her, she feared that Barnes would kill or seriously injure her. She further testified that he threatened to kill her several times before he left in her car.

Officer William Pursley testified that he went to collect fingerprints and any other physical evidence at the complainant's home. Officer Pursley testified that he was unable to collect any identifiable fingerprints at the crime scene but that it was not unusual for him to be unable to locate fingerprints at the crime scene. Officer McClosky testified that he sent the complainant's sexual assault kit to the Department of Public Safety in Garland. Later, he testified that he took the complainant's sexual assault kit to GeneScreen in Dallas in December 1989. After obtaining an evidentiary search warrant, the officer said that one of the officers working under his supervision got a sample of Barnes's blood and took it to the Dallas laboratory.

Dr. Robert Giles, an expert in deoxyribonucleic acid (DNA) testing at the GeneScreen Laboratory in Dallas, testified about what DNA is, where it is found, and how it separates from other parts of the cell. Dr. Giles described the four-step process to col-

lect, analyze, and categorize DNA. During the process, a technician isolates the DNA, uses an enzyme that cuts the DNA strands into segments, puts the DNA strands in a gel, and then sends an electric current through the gel. The technician transfers the DNA fragments to a nylon sheet of paper by diffusion and uses a DNA probe, a device to match DNA strands, to highlight the portion he wants to x-ray. The x-ray produces a permanent photograph of the DNA, called an autorad, which is used to identify criminal suspects.

Dr. Giles said that he conducted DNA tests on the sexual assault kit samples and Barnes's blood sample. He stated that the DNA pattern of the seminal fluid obtained from the sexual assault kit matched the DNA of Barnes's blood sample. He testified that he placed each sample in a different gel and then made a comparison. He said that this is a generally accepted technique in the scientific community. Dr. Giles further stated that, on the basis of his analysis of the two samples, the chances of the similarities in the two specimens arising were one in twenty-four million for North American blacks.

## Defense Testimony

Dr. Moses Schanfield, an expert in genetics, testified that he received and reviewed two packages from GeneScreen. Dr. Schanfield testified about what composes DNA and the technical procedures involved in identifying persons through their DNA. He further testified that the State's procedure to test the samples in two gels was not a good procedure and that variations between the two gels could create a problem. He also said that the method that GeneScreen used suffered from "band-shifting," that this phenomenon occurred in approximately twenty to thirty percent of the gels, and that the use of two gels accelerated the "band-shifting." On cross-examination, Dr. Schanfield testified that he had not run tests on the samples, but merely reviewed GeneScreen's analysis. He admitted that he could not exclude Barnes as a suspect.

Barnes's mother testified that her son always wore a mustache until the last year and that he was clean-shaven the year the "purported picture" of Barnes had been taken. Barnes's father testified that his son had a good working knowledge of how to start cars.

## Procedural History

On February 6, 1991, a grand jury indicted Barnes for aggravated sexual assault and burglary of a habitation. Barnes filed a plea of double jeopardy and a motion to suppress the complainant's in-court identification of him. The trial court overruled both of his motions.

## DOUBLE JEOPARDY

In his fifth point of error, Barnes contends that the trial court erred in overruling his motion for double jeopardy. Barnes argues that the complainant's testimony about the aggravated sexual assault and burglary of a habitation offenses at the punishment phase of his capital murder trial for an unrelated offense bars the State from using her testimony at his aggravated sexual assault and burglary of a habitation trial. He argues that her testimony proves the same conduct and allows the State to place his liberty in jeopardy twice.

The double jeopardy clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." *Ex parte Ramos*, 806 S.W.2d 845, 847 (Tex.Crim.App.1991). Double jeopardy, however, does not apply when a subsequent, unadjudicated offense is used at the punishment phase of a trial of the same defendant for a prior offense. *Lester v. State*, 824 S.W.2d 775, 778 (Tex. App.—Houston [14th Dist.] 1992, no pet.). The fact that the jury considered the defendant's subsequent criminal activity in assessing punishment for a previous conviction does not equate to a trial, conviction, or punishment for the unadjudicated offense. *Id.* at 778.

Before trial, Barnes notified the court, both orally and in writing, of his double jeopardy claim. Barnes argued that, since the complainant testified about Barnes's sexual assault and burglary of her home during the punishment phase of his capital murder trial for an unrelated offense in Lubbock, double jeopardy bars the State from prosecuting him for the aggravated sexual assault and burglary of a habitation offenses. Barnes asked the trial court to take judicial notice of the capital murder case in Lubbock. The trial court granted Barnes's request, noting that the same judge and defense counsel who tried Barnes's unrelated capital murder case in Lubbock were also trying the aggravated sexual assault and burglary of a habitation offenses at issue here. The trial court further noted that the prosecutors who tried the capital murder case were present in the courtroom for the trial of these cases. The capital murder jury's consideration of the aggravated sexual assault and burglary of the complainant's home in assessing punishment did not equate to a trial, conviction, or punishment for those two offenses. *See id.* at 778. Thus, when the State used Barnes's prior, unadjudicated offenses at the punishment phase of Barnes's capital murder trial for an unrelated offense, double jeopardy did not apply to his aggravated sexual assault and burglary of a habitation offenses. *Id.* Because the jury's consideration of these offenses at the punishment phase did not amount to a trial, conviction, or punishment for Barnes's aggravated sexual assault and burglary of a habitation offenses, the trial court did not err in overruling his plea of double jeopardy. We overrule Barnes's fifth point of error.

## SUFFICIENCY OF THE EVIDENCE

In his fourth point of error, Barnes contends that the evidence is insufficient to support his convictions. He argues that, because the in-court identification was tainted and the State's analysis of the DNA was incorrect, not enough evidence remains to support the jury's guilty verdict.

■ In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. *Turner v. State*, 805 S.W.2d 423, 427 (Tex. Crim.App.), *cert. denied,* — U.S. —, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). We must consider all of the evidence, whether properly or improperly admitted. *Thomas v. State*, 753 S.W.2d 688, 695 (Tex.Crim. App.1988). This standard applies in both direct and circumstantial cases. *Id.* In a circumstantial evidence case, the "reasonable doubt" portion of the test is satisfied if the evidence excludes every reasonable hypothesis except the appellant's guilt. *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Crim.App.1983) (op. on reh'g).[2] This does not mean that if evidence presented at trial suggests innocence, the trier of fact cannot find the defendant guilty. *Castro v. State*, No. 835–90, slip op. at 3, 1992 WL 1131 (Tex.Crim.App. January 8, 1992) (not yet reported). The reviewing court is not to position itself as a thirteenth juror in assessing the evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). Rather, it is to position itself as a final due process safeguard ensuring only the rationality of the factfinder. The trier of fact, not the appellate court, is charged with the responsibility of resolving factual questions. *Castro,* slip op. at 3; *Moreno,* 755 S.W.2d at 867. In this process, a trier of fact may reject evidence and testimony that suggests innocence. *Castro,* slip op. at 3. The trier of fact is the sole judge of the witnesses' credibility and can believe all or any part of the testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App. 1984).

■ The record shows that:

(1) The complainant testified that Barnes beat, raped, and robbed her;

(2) She further testified that during her ordeal she feared that Barnes would

---

**2.** The Court is aware of the Court of Criminal Appeals opinion in *Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Crim.App.1991), which overrules *Carlsen* and eliminates the "reasonable hypothe-sis" appellate construct for determining sufficiency. However, *Geesa* expressly applies only to cases tried after the issuance of the opinion. *Geesa,* 820 S.W.2d at 165.

kill or seriously injure her and that he threatened to kill her several times when he raped and robbed her;

(3) The complainant identified Barnes in open court and testified that she remembered him from the night that he raped and robbed her;

(4) Dr. Giles, an expert in DNA testing, testified that he tested the complainant's sexual assault kit and Barnes's blood sample, that the DNA pattern of the seminal fluid found in the sexual assault kit matched the DNA pattern of Barnes's blood sample, and that the similarities that he observed arising from the two samples were one in twenty-four million for North American blacks; and

(5) Dr. Schanfield, the defense expert in DNA testing, admitted during cross-examination that after his review of the two samples that he could not exclude Barnes as a suspect.

Viewing this evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Barnes sexually assaulted the complainant and burglarized her home. Because the evidence is sufficient to support Barnes's convictions, we overrule his fourth point of error.

### ILLEGAL SEARCH AND SEIZURE

In his second point of error, Barnes contends that the trial court erred in overruling his motion to suppress. Barnes argues that the State's DNA evidence was a product of an illegal search and seizure and, therefore, should be suppressed. He further argues that the police, intentionally or with reckless disregard for the truth, used false evidence to obtain his evidentiary search warrant and that, therefore, the issuance of the warrant was improper.

■ An objection stating one legal theory may not be used to support a different legal theory on appeal. *Johnson v. State*, 803 S.W.2d 272, 292 (Tex.Crim.App.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). If the objection at trial is different than the argument on appeal, then nothing is preserved for re-

view. *Cunningham v. State*, 815 S.W.2d 313, 318 (Tex.App.—Dallas 1991, no pet.). In order to challenge the validity of an affidavit or a search warrant, the defendant must object about the illegal search and seizure at trial or waive error. *McNairy v. State,* 835 S.W.2d 101, 107 (Tex.Crim.App.1991) (not yet reported).

■ At trial, the State sought to introduce Barnes's blood samples into evidence. Barnes objected on the grounds that:

(1) the probable cause for the warrant was based on an "impermissibly suggestive identification process";

(2) the information that formed the basis for the probable cause prong of the evidentiary search warrant for Barnes's blood sample was based on the search warrant from the capital murder case that had never been filed with any court; and

(3) the probable cause portion of the capital murder search warrant had never been notarized by the affiant.

On appeal, Barnes argues that the police, intentionally or with reckless disregard for the truth, used false evidence to obtain his evidentiary search warrant. Barnes asserts that:

(1) Officer McClosky, intentionally or with reckless disregard for the truth, lied in his affidavit when he said that he talked to the complainant after the newscast; and

(2) Dr. Giles's statements about the DNA match between the sexual assault kit and Barnes's blood sample amounted to mere suspicion, but not probable cause to obtain a warrant.

Because Barnes's objection at trial differs from his argument on appeal, he presents nothing for this Court to review. *See McNairy*, 835 S.W.2d at 107; *Johnson*, 803 S.W.2d at 292; *Cunningham*, 815 S.W.2d at 318. We overrule Barnes's second point of error.

### VALIDITY OF THE STATE'S DNA PROCEDURES

In his third point of error, Barnes contends that the trial court erred in admitting the State's DNA evidence. He argues that

the State failed to conduct its tests for DNA in accordance with accepted scientific procedures. Barnes further argues that the State's DNA testing procedures fail to meet the "general acceptance" criteria set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

Rule 702 of the Texas Rules of Criminal Evidence, not *Frye's* "general acceptance" test, governs the admissibility of scientific evidence at trial. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992). Rule 702 of the Texas Rules of Criminal Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX.R.CRIM.EVID. 702. For the trial court to decide whether to admit scientific evidence, the trial court must determine whether (1) the testimony is sufficiently reliable and relevant to assist the jury in reaching an accurate result and (2) the probative value of the evidence outweighs the factors set forth in rule 403 of the Texas Rules of Criminal Evidence, *i.e.*, danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. *Kelly*, 824 S.W.2d at 572.

Scientific evidence may be shown to be reliable, even though the relevant scientific community fails to embrace it. *Kelly*, 824 S.W.2d at 572. For a proponent to prove that novel scientific evidence is reliable, he must show that:

(1) the underlying scientific theory is valid;

(2) the technique applying the theory is valid; and

(3) the technique was properly applied on the occasion in question.

*Id.* at 573. The proponent must prove all three criteria to the trial court outside the presence of the jury. *Id.* Although not inclusive, the trial court can use the following criteria to determine the reliability of novel scientific evidence:

(1) the extent to which the relevant scientific community accepts the validity of the underlying scientific theory and technique, if such a community can be ascertained;

(2) the qualifications of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* Before the trial court may admit novel, scientific evidence at trial, the party seeking to introduce the evidence must persuade the trial court through clear and convincing evidence that the evidence is reliable and relevant. *Id.* The appellate court reviews the evidence in the light most favorable to the trial court's decision and, absent an abuse of discretion, we will not disturb the trial court's decision. *Id.* at 571, 574.

The record shows that:

(1) Dr. Giles testified that every person's DNA is unique;

(2) He stated that the theory and procedures used to make DNA have existed in the medical community for over ten years and that GeneScreen follows standard procedures that many United States laboratories follow;

(3) Dr. Giles said that GeneScreen uses the "Lifeprint Process," that he supervises the technicians at GeneScreen, that the DNA test procedure used is generally accepted by the scientific community, and that most of the scientific community believes that the size of the data base is adequate;

(4) Dr. Giles explained the four-step process that he based his testimony on to the court and the jury;

(5) Dr. Giles testified that he ran the sexual assault kit sample and the blood sample in two separate gels and that this method was generally accepted by the scientific community;

(6) He further testified that neither band-shifting nor star activity, two potential problems in DNA typing, occurred in running Barnes's case;

(7) Dr. Giles stated that, in the North American black community, the DNA pattern would be found in approximately one out of every twenty-four million black individuals tested; and

(8) Dr. Schanfield, Barnes's expert, testified that he did not consider Dr. Giles's method of running the sexual assault sample and Barnes's blood sample in two gels as generally accepted by the scientific community and found this to be an unreliable method, and that he could not exclude Barnes as a suspect in this case.

Viewing this evidence in the light most favorable to the trial court's decision, this Court concludes that the trial court did not abuse its discretion when it decided that the method that Dr. Giles used to conduct Barnes's DNA test were reliable, relevant, and probative. *See id.* at 574. Although Barnes's expert did dispute Dr. Giles's methodology, the judge can believe one expert's testimony over another expert's testimony. *See Sharp v. State,* 707 S.W.2d 611, 615 (Tex.Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). Because the trial court did not abuse its discretion in admitting Barnes's DNA test results, we overrule his third point of error.

### IN–COURT IDENTIFICATION

 In his first point of error, Barnes contends that the trial court erred in allowing the complainant's in-court identification of him. He argues that the pre-trial identification procedures tainted the complainant's in-court identification of him as the one who sexually assaulted her and burglarized her house. He further argues that the method the police used to help the complainant identify him created a substantial likelihood of misidentification that amounts to a denial of his right to due process.

The complainant identified Barnes after viewing an evening newscast. The record suggests three possible scenarios concerning this identification:

(1) At the trial, the complainant testified that Officer McClosky called her and told her to watch the news;

(2) At the pre-trial suppression hearing, Barnes offered the prior testimony of the complainant from his capital murder trial, in which the complainant stated that she called Officer McClosky after she saw Barnes on the television news; and

(3) At the pretrial suppression, Barnes also offered the prior testimony of Officer McClosky from his capital murder trial, in which the officer stated that he called the complainant after she had seen Barnes on the television news.

As the trier of fact on the admission of the in-court identification, the judge could choose to believe or disbelieve any or all of the testimony of either the complainant or Officer McClosky. *See Williams,* 692 S.W.2d at 676. The judge could believe that (1) Officer McClosky called the complainant and told her to watch the television news, (2) the complainant watched the news and then called the police, or (3) Officer McClosky called the complainant after she watched the television news. Because the trial court could choose to believe that the police spoke with the complainant after she watched the newscast, the pre-trial identification did not taint her in-court identification and the trial court did not err in allowing the complainant's in-court identification of Barnes. We overrule Barnes's first point of error.

We affirm the trial court's judgments.