**Jesse HERNANDEZ, a/k/a "Bumpy," Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–99–568–CR.**

Court of Appeals of Texas, Corpus Christi.

June 21, 2001.

Rehearing Overruled Sept. 6, 2001.

Leslie Werner De Soliz, Brown & Associates, Victoria, for Appellant.

Carlos Valdez, Dist. Atty., Corpus Christi, for Appellee.

Before HINOJOSA, YAÑEZ, and CHAVEZ,[1] JJ.

## OPINION

HINOJOSA, Justice.

A jury found appellant, Jesse Hernandez a/k/a "Bumpy," guilty of engaging in organized criminal activity [2] and murder [3] and assessed his punishment at life imprisonment and a $5,000 fine for the organized criminal activity and fifty years imprisonment and a $5,000 fine for the murder. Both sentences were ordered to run concurrently. In fourteen issues, appellant contends: (1) the evidence is legally and factually insufficient to support the judgment; (2) he received ineffective assistance of counsel during trial; (3) the trial court erred by admitting improper evidence; and (4) a fatal variance exists between the offenses charged in the indictment and the evidence presented at trial. We affirm.

### A. EVIDENCE AT TRIAL

It is undisputed that on August 10, 1998, the victim, Luis "Huicho" Luna ("Luis"), was shot to death. What is disputed is the role appellant played in the murder.

The State sought to prove that appellant, Jesse "Trece" Casso ("Casso"), Jeremy Munguia ("Munguia"), Rudy "Rhino" Contreras ("Contreras") and Jason "Chino Boy" Luna ("Jason"), all members of the "Raza Unida" gang, conspired to murder Luis in retaliation for allegedly being disrespectful to a Raza Unida officer. The record reflects that Luis's body was found lying beside Carbon Plant Road in Corpus Christi, near a burning Oldsmobile which

had been stolen several days before. Testimony showed that the murder occurred between 1:45 and 2:15 a.m. on August 10, 1998. The autopsy established that Luis died from eight bullet wounds to the abdomen, neck, chest and head.

### 1. *Testimony of Investigating Officers*

According to Officer Thomas Mylett, Contreras told him where to find the Norinco SKS semi-automatic rifle used in Luis's murder. Contreras also told Mylett that he had been ordered to perform a hit on someone named Lance, but that he did not want to do it. John Hornsby, firearms examiner for the Corpus Christi Police Department, testified that bullets removed from Luis's body were fired from the recovered rifle.

### 2. *Testimony of Contreras*

Contreras was a member of Raza Unida, a gang that was involved in "a lot of drug dealing, killings [and] beating up people." Raza Unida has a certain symbol or emblem and a chain of command. Contreras and Munguia were soldiers; Casso was a captain; Jason and Luis were "prospects." Luis was in trouble with the gang because he had left a Raza Unida party to be with a girl, cursed at Raza Unida members, and placed a gun on a table so that it pointed at a Raza Unida ranking officer named Sapo. Sapo told Contreras, "[T]hat's automatic death, you know, put him in a box, that's disrespect."

Contreras, appellant, and Munguia went to Casso's house so that appellant could give Casso some money. While they were

---

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX.GOV'T CODE ANN. § 74.003 (Vernon 1998).

2. *See* TEX.PEN.CODE ANN. § 71.02(a) (Vernon Supp.2001).

3. Appellant was found guilty of murder as a party. *See* TEX.PEN.CODE ANN. § 7.02 (Vernon 1994); TEX.PEN.CODE ANN. § 19.02(b) (Vernon 1994).

there, Casso told them that Luis had to be killed. Casso chose Contreras, Munguia, and Jason to kill Luis. Casso whispered something in appellant's ear while looking at Contreras. The men left in Contreras's car, and dropped appellant off. Before they left appellant's house, appellant put his arm around Contreras's shoulder and said, "You know what time it is, right? Y'all better do it. If you don't do it, you know what is going to happen." Contreras understood that to mean that he would be killed if he did not kill Luis.

Contreras drove to appellant's "tienda,"[4] which is a crack house," and picked up Jason. Munguia then told Contreras to drive to Munguia's house, which was close to Luis's house. Munguia exited the vehicle and returned with Luis. The group proceeded to Munguia's house, where there was a maroon Oldsmobile parked in the garage. Munguia gave Luis and Jason each a pair of gloves, and told them to follow him and Contreras. The group proceeded to the home of Munguia's brother and picked up a gun wrapped in a pink towel. They all then got into the Oldsmobile. Contreras drove, Luis was in the front passenger seat, Jason was in the left back seat, and Munguia was in the right back seat. Munguia said, "Nobody better hesitate." Munguia told Contreras to exit the freeway. Contreras felt the gun touch the back of his head and then his right shoulder. Munguia directed Contreras to stop the car so he could put the gun in the trunk. They all got out of the car, and Contreras thought he was going to be killed because he owed Raza Unida member Mark Alaniz some drug money. Jason shot Luis multiple times. Before he was shot, Luis asked in Spanish, "What did I do?"

Afterwards, the remaining three got back in the car and Contreras drove until he was ordered to stop. Munguia and Jason exited the car and returned without the gun. They picked up Contreras's car and drove it to a location near a refinery. Jason followed in the Oldsmobile. Munguia and Jason set the Oldsmobile on fire, and all three rode in Contreras's car to appellant's house.

When they reached appellant's house, they knocked at the back door. Appellant appeared, got a trash bag, put the gloves in the trash bag, and "suggested he would get rid of all the evidence." Appellant noticed Jason had a lot of blood on his clothing. Appellant got some clothes from his room and instructed Jason to take a shower, telling him to "scrub his hands real good because he might have some gun powder on his hands." Appellant washed Jason's clothes in the washing machine. Jason changed into appellant's clean clothes. Contreras dropped off Munguia and Jason and returned to appellant's house, where he and his wife and son were living.

Contreras testified that he had been a member of Raza Unida for a year and a half. He joined because he was told that Raza Unida "was more than a prison gang. They would help you out." He did not realize what he was getting into. They told him they would provide him with a place to live and money. He had no place to stay, and moved into appellant's house. Soon he learned there were strings attached; "you have to do what you're told." At first, Contreras was sent to collect money from various people; if they didn't pay, he had to beat them up. He also sold drugs and acted as a drug courier for the gang.

Contreras was a "prospect" for six months. He proved himself by following

4. "Tienda" is Spanish for "store."

orders. If you do not follow the rules in Raza Unida, there are three levels of sanctions. The first level, a "30–second workout," is when three guys beat you up for 30 seconds. The next level, a "30–minute workout," "[t]hey just beat you up real bad which is called H Town [meaning 'hospital'] ... they just beat you up to where you can't get up no more." The third level is called being "put in a box," which means you will be killed. If you are supposed to do a "cameo" or hit and you hesitate, you are automatically killed too. As a Raza Unida prospect, Contreras participated in the first two levels of sanctions. He wanted out of the gang, but there was no way out except death. That's when he decided to call the police. He did not want to participate in Luis's murder, but he could not refuse or inform the police because his wife and baby son were at appellant's house, and he knew the gang would retaliate against them.

Contreras, Munguia, Jason, and another Raza Unida member by the name of Fabian were ordered to kill Lance, who was not a member of Raza Unida, because Lance was "[p]utting Mark [Alaniz] down and trying to take away Mark's connection ... his supplier." Contreras knew that another Raza Unida member, Mark Posada, had been killed because he had hesitated to carry out a hit. The punishment for giving a statement or testifying is death. Contreras knew the location of the murder weapon in this case because appellant told him where it was and offered him money to retrieve it. That is when Contreras contacted the police. In exchange for his testimony, Contreras was given deferred adjudication probation for ten years.

### 3. *Testimony of Munguia*

Munguia testified that he had become a member of Raza Unida when he was in prison for burglary, theft, unauthorized use of a motor vehicle, and possession of cocaine. His father is a ranking Raza Unida member. Munguia went with appellant and Contreras to Casso's house because appellant had to drop off money from drug sales. Casso sent Munguia, appellant, and Contreras to kill Luis. They dropped off appellant, who told Contreras to "[m]ake sure the job is done. If not, you know what it is." They picked up Jason at appellant's crack house. Jason had to kill somebody to become a full-fledged Raza Unida member. Munguia told Jason what he had to do. Then they picked up Luis, telling him he was going to "do a hit" in Odem, Texas. They first stopped to buy gloves at a Circle K, so that fingerprints would not get on the gun or the stolen car. They then went to Munguia's house and wiped down the stolen car, which was in the garage. Paul Moreno had stolen the car for appellant. Munguia was "taking care of" the car for appellant, who wanted the motor.

Jason and Luis got in the stolen car and Munguia and Contreras got back in Contreras's car. They drove to a house on Leopard Street and picked up the gun. They then got back in the stolen car and drove on Interstate Highway 37 toward Odem. Munguia told Contreras to exit when he realized Luis was suspicious. Munguia told Luis that they needed to stop so he could put the gun in the trunk. When they got out, Munguia and Jason walked back toward the truck. Jason shot Luis as he was getting out of the car. Luis fell back in the car with his head resting on the passenger seat. Jason shot him again in the head. Jason shot Luis a total of eight times. There were eight bullets in the clip. Luis's last words were, "Que hice yo?"[5] After driving to a back

5. "Que hice yo" is spanish for "what did I do."

road, Munguia and Jason left the gun between some bushes and a fence. They picked up Contreras's car, stopped to buy lighter fluid at a Coastal Mart, then torched the stolen car. They then went to appellant's house; appellant opened the door and took the gloves. The back of Jason's shirt was bloody because he sat in the front passenger seat, which was covered with Luis's blood. Appellant put Jason's clothes in the washer and called Casso to tell him the hit was done.

Munguia was a soldier in Raza Unida. He was obligated to take orders from Casso, but was not obligated to take orders from other soldiers. Death is the punishment for not following orders. Munguia knew Raza Unida members who had been killed for not following orders: Mark Posada, Isaac Soliz, Luis and others.

In exchange for his testimony, Munguia received a plea-bargained sentence of ten years in prison. He "strongly" believes he will not survive his prison term.

While he was incarcerated in the Nueces County Jail, a Raza Unida member named Johnny Esparza told Munguia that appellant had said Munguia would be killed because he was a police informant. At the time, Munguia had not cooperated with the police. Munguia's girlfriend called the police, and he and Esparza were removed from the Raza Unida section at the jail.

### 4. Testimony of DPS Criminalist

Charles Parker, a criminalist with the Texas Department of Public Safety, determined that two letters were most likely written by Jason. The two letters were admitted into evidence.

One letter is to his "Nana." In the letter, Jason says that he is "in a gang call [sic] RAZA UNIDA." He also says: "I did kill someone . . . yes I did."

### 5. Testimony of Alice Alaniz

Alice Alaniz had a two and one-half year relationship with appellant, and they have a child together. She was living with appellant on August 10, 1998. They were in bed that night when the doorbell rang between 1:30 and 2:00 a.m. Appellant answered the door, and Alaniz heard the voices of Munguia, Jason and Contreras. Appellant got some clothes from their bedroom and gave them to Jason. The washer was turned on during the visit. When she looked in the washer the next morning, she found shorts, a "Nike" shirt and a pair of white "Converse All–Stars." She knew the clothing belonged to Jason because she and appellant frequently bought clothing for Raza Unida members. In exchange for her testimony, Alaniz was to receive a lesser sentence on a drug possession charge.

### 6. Testimony of Johnny Joe Esparza

Johnny Joe Esparza was a Raza Unida soldier in October 1998. On October 18, 1998, while they were incarcerated together at the Nueces County Jail, appellant told Esparza there was going to be a hit on Munguia because he was a "snitch." Appellant was waiting on the "paperwork" from Raza Unida officers Roman "Boo" Felan and Raul "Buga" Sanchez. Appellant said Esparza had to do the hit "to get [himself] out of the dark side of the organization" because he owed money. Technically, Esparza did not feel appellant had the authority to order the hit without the "paperwork" because appellant was just a soldier, like Esparza. However, in reality, Esparza felt that appellant did have authority to issue his own orders because he was very close to Casso. Appellant was a "moneymaker" for Casso. If appellant had told Esparza to kill someone, he would have done it. He did not want to kill Munguia because they were "home boys."

Appellant's plan was to provoke a fight with Munguia's brother, who was also in jail, then kill Munguia when he joined in. Appellant told Esparza that the weapon they would use was a "grill from a light taken off from the visiting side of the inmates which was folded in pieces into a trash bag."[6] Later, when Esparza saw Munguia, he told him he was going to be hit for being a snitch. Munguia's wife contacted the police and Esparza and Munguia were removed from the jail unit about thirty minutes later in a staged "shakedown." He received shock probation on a prior conviction in exchange for his testimony. Esparza is currently incarcerated on other, unrelated charges, but does not have a deal.

## B. Sufficiency of the Evidence

When an appellate court reviews the legal sufficiency of the evidence, it looks at all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Patrick v. State*, 906 S.W.2d 481, 486 (Tex. Crim.App.1995); *Turro v. State*, 867 S.W.2d 43, 46–47 (Tex.Crim.App.1993). Sufficiency of the evidence is measured by the hypothetically correct jury charge, which accurately sets out the law, is authorized by the indictment, and does not unnecessarily increase the State's burden of proof. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997); *Cano v. State*, 3 S.W.3d 99, 105 (Tex.App.—Corpus Christi 1999, pet. ref'd). The jury, as the sole judge of the credibility of the witnesses

and the weight to be given their testimony, is free to accept or reject all or any part of the testimony of any witness. Tex.Code Crim.Proc.Ann. art. 38.04 (Vernon 1981); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim.App.1986); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982).

When an appellate court reviews the factual sufficiency of the evidence, it views all the evidence in a neutral light, and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Johnson*, 23 S.W.3d at 6–7 (citing *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim.App.1996)). The appellate court considers all of the evidence in the record related to the appellant's sufficiency challenge, comparing the weight of the evidence that tends to prove guilt with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim.App.1997). In conducting its factual sufficiency review, the appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination. *Johnson*, 23 S.W.3d at 7; *Clewis*, 922 S.W.2d at 133. However, this review must employ appropriate deference to prevent the appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 7; *Jones v. State*, 944 S.W.2d 642, 648 (Tex.Crim.App.1996). The fact finder may believe one version of the facts over another. *See, e.g., Nonn v. State*, 13 S.W.3d 434, 441–42 (Tex.App.— Corpus Christi 2000), *rev'd on other grounds*, 41 S.W.3d 677, 2001 Tex.Crim.App.LEXIS 24 (Tex.Crim.App.

---

**6.** Officer Gary Smith testified that such a grill could be used to fashion a weapon capable of serious bodily injury or death.

2001); *Barnes v.. State*, 839 S.W.2d 118, 122 (Tex.App.—Dallas 1992, pet. ref'd).

In the instant case, appellant was charged by indictment with one count of engaging in organized criminal activity ("EOCA") in two separate paragraphs. The first paragraph alleges appellant conspired to murder Luis as a member of a combination. The second paragraph alleges appellant conspired to murder Luis as a member of a criminal street gang, Raza Unida.

The penal code provides that a person commits the offense of EOCA "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit ... murder." TEX.PEN.CODE ANN. § 71.02(a) (Vernon Supp.2001). A "combination" means three or more persons who collaborate in carrying on criminal activities. TEX.PEN.CODE ANN. § 71.01(a) (Vernon Supp.2001). A "criminal street gang" means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities. TEX.PEN.CODE ANN. § 71.01(d) (Vernon Supp.2001). "Conspires to commit" means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. TEX.PEN.CODE ANN. § 71.01(b) (Vernon Supp.2001). An agreement constituting conspiring to commit may be inferred from the acts of the parties. *Id.*

◼ In his first issue, appellant contends the evidence is insufficient to prove he collaborated in carrying on criminal activities. In support of this contention,

appellant cites *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex.Crim.App.1999).

In the *Nguyen* case, Nguyen and several other men conspired to kill a man they thought had insulted a woman friend of theirs. *Id.* at 695 n. 1. The court of criminal appeals reversed Nguyen's EOCA conviction because there was no evidence that he had participated in any offense, other than the murder in question. *Id.* at 696. The court held that proof of "something more" than the enumerated underlying offense is required to sustain an EOCA conviction. *Id.* The instant case is very different.

In this case, the evidence shows: (1) that appellant was a member of Raza Unida, a criminal street gang having an identifiable sign and an identifiable leadership; (2) that Raza Unida was engaged in various aspects of the drug trade; (3) that appellant ran a crack house for Casso; (4) that appellant was present when Casso gave the order to kill Luis; (5) that Luis's murder was in furtherance of the criminal street gang's objectives; and (6) that appellant committed an overt act by threatening Contreras and by participating in the destruction of evidence of the crime. The trial testimony also shows that appellant continued his criminal activities even while incarcerated in the Nueces County Jail, where he attempted to arrange Munguia's murder. Accordingly, we hold the evidence is legally and factually sufficient to support the jury's verdict that appellant committed the offense of EOCA.

◼ In his fourth issue, appellant contends the evidence is insufficient to support his murder conviction. Specifically, he asserts that because there is no evidence showing he was present at the scene of the murder, the evidence is insufficient to sustain a murder conviction. Appellant, however, was indicted for murder as a

party.[7] Under the law of parties, it was not necessary for the State to prove that appellant was present when the offense was committed. *See Morrison v. State,* 608 S.W.2d 233, 234–35 (Tex.Crim.App. 1980); *Cross v. State,* 550 S.W.2d 61, 64 (Tex.Crim.App.1977).

█ In his second issue, appellant contends the evidence is insufficient to support his conviction for EOCA because there was no non-accomplice testimony corroborating his participation in organized criminal activity. In his third issue, he contends the evidence is insufficient to support the murder conviction because there is no non-accomplice testimony corroborating his participation in the murder.

█ A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. TEX.CODE CRIM.PROC. art. 38.14 (Vernon 1979). In order to determine whether the accomplice testimony is corroborated, we eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense. *McDuff v. State,* 939 S.W.2d 607, 612 (Tex.Crim.App.1997); *Burks v. State,* 876 S.W.2d 877, 887 (Tex.Crim.App. 1994); *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993). The accomplice testimony need not be corroborated on every element of the offense. *Warren v.*

*State,* 514 S.W.2d 458, 463 (Tex.Crim.App. 1974), *overruled on other grounds, Reed v. State,* 744 S.W.2d 112 (Tex.Crim.App. 1988); *Griffin v. State,* 936 S.W.2d 353, 357 (Tex.App.—Houston [14th Dist.] 1996, pet ref'd). The non-accomplice testimony does not have to directly link the appellant to the crime, nor does it have to establish his guilt beyond a reasonable doubt; but rather, the non-accomplice evidence merely has to tend to connect appellant to the offense. *McDuff,* 939 S.W.2d at 613; *Burks,* 876 S.W.2d at 888. Thus, there must simply be some non-accomplice evidence which tends to connect appellant to the commission of the offense alleged in the indictment. *McDuff,* 939 S.W.2d at 613; *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim.App.1994). All of the surrounding facts and circumstances may be looked to for corroboration, and the corroborative evidence may be circumstantial or direct. *Brown v. State,* 672 S.W.2d 487, 488 (Tex. Crim.App.1984). Evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence. *McDuff,* 939 S.W.2d at 613; *Cockrum v. State,* 758 S.W.2d 577, 581 (Tex.Crim.App.1988).

█ Here, the testimony of Alice Alaniz, appellant's girlfriend, shows that: (1) appellant was in the company of his accomplices near the time of the offense; (2) he washed Jason's clothing; and (3) he gave Jason clean clothing.[8] This evidence tends to connect appellant with the murder.

---

**7.** A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense. *See* TEX.PEN. CODE ANN. § 7.02(a)(2) (Vernon 1994).

**8.** Acts committed after the offense is completed cannot make one a party to the offense.

*Morrison v. State,* 608 S.W.2d 233, 235 (Tex. Crim.App.1980). However, acts committed before, during and after the offense may be considered by the court in deciding whether a defendant participated in a common scheme for purposes of party liability. *Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim.App.1985); *Suarez v. State,* 31 S.W.3d 323, 327 (Tex.App.—San Antonio 2000, no pet.).

Esparza's testimony establishes that appellant was a Raza Unida member engaged in criminal activities that were ordered by Raza Unida officers, specifically the planned murder of Munguia in the Nueces County Jail in retaliation for "snitching" about the murder of Luis Luna. This evidence tends to connect appellant both to Luis's murder and to his participation in the ongoing criminal activities of Raza Unida. We hold there is sufficient non-accomplice evidence corroborating appellant's convictions for EOCA and murder.

In his fifth issue, appellant contends the evidence is insufficient to support a murder conviction under the law of parties because there is "no evidence of an agreement to kill Luis Luna before or contemporaneous with the murder."

Participation in a criminal offense may be inferred from the circumstances. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App.1987). While agreement by the parties to act together in a common design can seldom be proved by direct evidence, reliance can be had on the actions and words of the parties showing, by direct or circumstantial evidence, an understanding and common design to do a certain act. *Ex parte Prior*, 540 S.W.2d 723, 727–28 (Tex.Crim.App.1976).

Contreras and Munguia both testified that appellant encouraged the murder by threatening Contreras. Appellant argues that because there is no non-accomplice corroboration of this fact, the evidence is insufficient to sustain his murder conviction. However, as we noted above, the State is not required to corroborate accomplice testimony on every element of the offense. *See Warren*, 514 S.W.2d at 463; *Griffin*, 936 S.W.2d at 357. Instead, we look to see if there is non-accomplice evidence tending to connect the defendant with the offense. *See McDuff*, 939 S.W.2d

at 613. As we also noted above, both the EOCA conviction and the murder conviction were sufficiently corroborated by non-accomplice evidence.

In his sixth issue, appellant complains the evidence is insufficient to support his murder conviction under the law of parties because he did not know of the "intent of the murderer to commit the crime." He contends "the evidence established that [he] did not know the murder would result from Jason Luna's 'shooting with a firearm.'"

The testimony of both Contreras and Munguia establish that appellant encouraged the murder when he threatened Contreras, and that he had full knowledge of the plan to kill Luis. As we noted above in the discussion of appellant's fifth issue, it is not necessary for the State to provide non-accomplice testimony of every element of the crime. *See Warren*, 514 S.W.2d at 463; *Griffin*, 936 S.W.2d at 357. Instead, we look to see if there is non-accomplice evidence tending to connect the defendant with the offense. *See McDuff*, 939 S.W.2d at 613. We hold that both the EOCA conviction and the murder conviction were sufficiently corroborated by non-accomplice evidence.

In his eighth issue, appellant contends the trial court erred in denying his motion for directed verdict because the evidence was insufficient to prove he committed all the overt acts alleged in the indictment.

The standard of review applicable to a motion for directed verdict is the same as that used in reviewing the legal sufficiency of the evidence. *Havard v. State*, 800 S.W.2d 195, 199 (Tex.Crim.App.1989); *Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim.App.1989). Both paragraphs of the EOCA count allege appellant committed the following overt acts:

by threatening Rudy Contreras, by taking gloves from Rudy Contreras, Jeremy Munguia and Jason Luna after the killing of Luis Luna, by taking Jason Luna's clothes after the killing of Luis Luna, and by allowing Jeremy Munguia, Jason Luna, and Rudy Contreras to enter a house following the murder of Luis Luna ...

The testimony of Contreras and Munguia establishes that appellant performed all these overt acts. The testimony of Alaniz provides sufficient non-accomplice testimony.

We hold the evidence is legally and factually sufficient to support appellant's convictions for EOCA and murder. Appellant's first, second, third, fourth, fifth, sixth, and eighth issues are overruled.

## B. VARIANCE

In his ninth issue, appellant contends there is a fatal variance between the crimes charged in the indictment and the State's evidence at trial. Specifically, appellant asserts that a variance resulted in the charging of the overt acts in the ECOA in the conjunctive, but the jury charge was worded in the disjunctive.

The jury charge stated:

JESSE HERNANDEZ aka BUMPY did perform the overt act of threatening Rudy Contreras *or* taking gloves from Rudy Contreras, Jeremy Munguia and Jason Luna after the killing of Luis Luna, *or* by taking Jason Luna's clothes after the killing of Luis Luna *or* by allowing Jeremy Munguia, Jason Luna and Rudy Contreras to enter a house following the murder of Luis Luna ...

(emphasis added).

It is well-settled that it is proper for an indictment to allege the ways an offense may have been committed in the conjunctive, and for the different ways to be charged to the jury in the disjunctive. *Rosales v. State,* 4 S.W.3d 228, 231 (Tex. Crim.App.1999); *White v. State,* 890 S.W.2d 69, 72 (Tex.Crim.App.1994); *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex. Crim.App.1991). We hold there was no fatal variance between the indictment and the State's evidence at trial. We overrule appellant's ninth issue.

## C. EVIDENTIARY ISSUES

In his eleventh issue, appellant contends the trial court erred in allowing Esparza's testimony regarding appellant's threats. Appellant asserts this violated Texas Rule of Evidence 404(a) because it made an impermissible inference concerning appellant's character. In his twelfth issue, appellant asserts the trial court violated Texas Rule of Evidence 404(b) in admitting this evidence. ·

The admission or exclusion of evidence is within the discretion of the trial court, *see Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999), including the admission of extraneous offense evidence during the guilt-innocence phase. *Lawton v. State,* 913 S.W.2d 542, 552 (Tex.Crim. App.1995); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990). Rule 404(a) provides that evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion. TEX.R.EVID. 404(a). However, rule 404(b) provides that evidence of other crimes, wrongs, or acts may:

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ...

TEX.R.EVID. 404(b); *see also, Montgomery,* 810 S.W.2d at 390–91. A party may introduce such evidence where it logically serves to make more or less probable (1) an elemental fact, such as intent or identi-

ty, (2) an evidentiary fact, such as motive, opportunity, or preparation, leading inferentially to an elemental fact, or (3) defensive evidence undermining an elemental fact. *Santellan v. State*, 939 S.W.2d 155, 168–69 (Tex.Crim.App.1997). Evidence of extraneous offenses is admissible to corroborate accomplice witness testimony. *Lawton v. State*, 913 S.W.2d 542, 553 n. 9 (Tex.Crim.App.1995).

Appellant characterizes Esparza's testimony as being admitted:

> for the sole purpose of proving [appellant] threatened Rudy Contreras. The State wanted the jury to believe that if [appellant] threatened Esparza, then he must also have threatened Rudy Contreras.

However, under Rule 404(b), Esparza's testimony regarding appellant's plan to murder Munguia while they were all confined in the Nueces County Jail was relevant to material issues in the case. It showed appellant's authority to order other Raza Unida members to commit murder and appellant's strong desire to murder Munguia, even before the "paperwork" from Raza Unida officers was received, in retaliation for Munguia's alleged cooperation with the police in the Luis Luna murder investigation. This is non-accomplice testimony tending to connect appellant with Luis's murder. In other words, appellant's plan to kill Munguia for "snitching," independent of Raza Unida orders, suggests that appellant had a personal motive for wanting Munguia dead, *i.e.*, to cover up his own involvement in Luis's murder. We hold the trial court did not err in admitting Esparza's testimony.[9] Appellant's eleventh and twelfth issues are overruled.

■■■ In his fourteenth issue, appellant contends he is entitled to a new trial because the trial court erred in allowing witnesses to testify concerning his gang-related activities "because his participation in a gang would not be admissible if he were being tried solely for murder."

However, appellant overlooks the fact that he was also charged with one count of EOCA, making evidence of his gang involvement necessary to prove that (1) appellant was a member of Raza Unida, and (2) Raza Unida was a criminal street gang, which is defined as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." (Tex.Pen.Code.Ann. § 71.01(d) (Vernon Supp.2001)); *see also Roy v. State*, 997 S.W.2d 863, 867 (Tex.App.—Fort Worth 1999, pet. ref'd) (when a defendant is charged with EOCA under section 71.02 of the penal code, the State is entitled to introduce evidence that the defendant was a gang member and regularly engaged in criminal activities such as the illegal sale and distribution of drugs).

Appellant could have moved to sever the counts,[10] but elected not to do so. Even if

---

9. We note that in order for extraneous offense evidence to be admissible, a two-part test must be met. First, the transaction must be relevant to a material issue in the case, and second, the relevancy value of the evidence must outweigh its inflammatory or prejudicial potential. *Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex.Crim.App.1990); *Crank v. State*, 761 S.W.2d 328, 342 (Tex.Crim.App. 1988); *Perry v. State*, 933 S.W.2d 249, 253 (Tex.App.—Corpus Christi 1996, pet. ref'd).

However, appellant has not raised the second requirement as an issue on appeal, so we will not address it. Tex.R.App.P. 47.1.

10. *See* Tex.Pen.Code Ann. § 3.04(a) (Vernon Supp.2001) (defendant has an absolute right to sever two or more consolidated offenses); however, if the cases are severed and the defendant is convicted on both charges, the trial court may order the two sentences to run consecutively. *See* Tex.Pen.Code Ann. § 3.04(a) (Vernon Supp.2001).

he had, because the motive for the murder was that Luis had broken Raza Unida rules and disrespected an officer, evidence concerning appellant's membership in Raza Unida, and Raza Unida's various criminal activities, could still have been admissible under Texas Rule of Evidence 404(b) as evidence of the motive, plan, preparation, knowledge or intent of the participants. *See* Tex.R.Evid. 404(b).

We find no abuse of discretion in the trial court's admission of testimony of appellant's gang membership and gang-related activities. Appellant's fourteenth issue is overruled.

### D. Ineffective Assistance of Counsel

 In his seventh, tenth, and thirteenth issues, appellant contends he received ineffective assistance of counsel. Claims of ineffective assistance are analyzed under the rule set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by Texas courts in *Hernandez v. State*, 726 S.W.2d 53, 56–56 (Tex.Crim. App.1986). The *Strickland* test is the benchmark for judging whether counsel's conduct has so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999) (citing *McFarland v.. State*, 845 S.W.2d 824, 843 (Tex.Crim.App.1992)). The appellant must first show that trial counsel's performance was not reasonably effective, falling below an objective standard of reasonableness under the prevailing professional norms. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Thompson*, 9 S.W.3d at 812–13. A showing of deficiency requires a demonstration that trial counsel made errors so serious that he was not functioning as the counsel guaranteed a defendant under the Sixth Amendment.

*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. We must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that counsel made all significant decisions in the exercise of reasonable professional judgment. *Young v. State*, 991 S.W.2d 835, 837 (Tex.Crim.App.1999). There is also a strong presumption that trial counsel's conduct was reasonable and constitutes sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *McFarland*, 845 S.W.2d at 843. The "reasonably effective assistance" standard does not mean errorless counsel. *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex.Crim.App. 1991); *Hernandez v. State*, 799 S.W.2d 507, 508 (Tex.App.—Corpus Christi 1991, pet. ref'd).

 If the appellant can demonstrate deficient assistance under the first part of the *Strickland* test, he must then show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Thompson*, 9 S.W.3d at 812; *Washington v. State*, 771 S.W.2d 537, 545 (Tex.Crim.App.1989). "A reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Thompson*, 9 S.W.3d at 812; *Ex parte Walker*, 777 S.W.2d 427, 430 (Tex.Crim.App.1989). The prejudice element requires a showing that trial counsel's errors were so serious as to deprive the defendant of a fair trial-one whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The totality of the representation is evaluated from counsel's perspective at trial, not his isolated acts or omissions in hindsight. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Crim.App.1990); *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986).

■ The assessment of whether a defendant received effective assistance of counsel must be made according to the facts of each case. *Ex parte Scott*, 581 S.W.2d 181, 182 (Tex.Crim.App.1979); *Stone v. State*, 17 S.W.3d 348, 350 (Tex. App.—Corpus Christi 2000, pet. ref'd). The appellant must prove his claim of ineffective assistance of counsel by a preponderance of the evidence. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). Furthermore, he must show ineffective assistance firmly rooted in the record. *Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim.App.1994). We may not speculate as to the reasons behind trial counsel's actions nor should we try to second guess trial counsel's tactical decisions which do not fall below the objective standard of reasonableness. *Young*, 991 S.W.2d at 837–38; *Solis v. State*, 792 S.W.2d 95, 100 (Tex.Crim.App.1990); *Stone*, 17 S.W.3d at 350.

■ In his seventh issue, appellant complains he received ineffective assistance of counsel because his trial counsel failed to object to the court's instruction in the charge on the law of parties. Appellant asserts the evidence was legally insufficient to sustain a conviction on the law of parties due to the State's failure "to offer any evidence that [appellant] was present at the commission of the offense, or that he participated as a party before or contemporaneous with the murder."

We have already held the evidence is legally sufficient to sustain appellant's conviction of murder as a party. Because the instruction on the law of parties was supported by the evidence, we conclude appellant's trial counsel was not ineffective for failing to object to its inclusion in the charge. Appellant has, therefore, failed to overcome the presumption of reasonableness, and has failed to meet the first requirement of the *Strickland* test.

■ In his tenth issue, appellant contends he received ineffective assistance of counsel because his trial counsel failed to object to the charge based on a variance between the offenses charged and the proof at trial. We have already held there is no variance between the offenses charged in the indictment and the State's proof at trial. Because there is no variance, we conclude appellant's trial counsel was not ineffective for failing to object to the charge on this basis. Appellant has, therefore, failed to overcome the presumption of reasonableness, and has failed to meet the first requirement of the *Strickland* test.

■ In his thirteenth issue, appellant asserts he received ineffective assistance of counsel because his trial counsel failed to object to the admission of Esparza's testimony. However, in the briefing of his eleventh and twelfth issues concerning the propriety of the admission of this evidence, appellant says that his trial counsel *did* object to the admission of Esparza's testimony. The record shows that counsel did object. Therefore, appellant has preserved nothing for appeal on this issue.

Even if appellant's trial counsel had failed to object to the admission of Esparza's testimony, we have held that the trial court did not abuse its discretion in admitting this testimony. Therefore, appellant's trial counsel would not have been ineffective for failing to object to the testimony. Because appellant would have failed to overcome the presumption of reasonableness, and would have failed to meet the first requirement of the *Strickland* test, we would overrule this issue.

After reviewing the entire record, we cannot say that appellant received ineffective assistance of counsel. Appellant's seventh, tenth, and thirteenth issues are overruled.

The judgment of the trial court is affirmed.